Sadie **HENDREN**, Plaintiff,

v.

**Wilbur J. COHEN, Secretary of Health, Education and Welfare, Defendant.**

No. 329.

United States District Court
E. D. Kentucky,
Richmond Division.

Jan. 17, 1969.

Fowler, Rouse, Measle & Bell, by Walter C. Cox, Jr. and Darrell B. Hancock, Lexington, Ky., for plaintiff.

George I. Cline, U. S. Atty., by Moss Noble, Asst. U. S. Atty., Lexington, Ky., for defendant.

## MEMORANDUM

SWINFORD, Chief Judge.

The plaintiff, Sadie Hendren, brings this action under the provisions of 42 U.S.C. § 405(g). Her application for disability benefits under the Social Security Act was filed on January 31, 1967, and alleged that she became unable to work because of disability in January 1965. The application was denied initially and on reconsideration. She then requested a hearing and on October 13, 1967, she appeared before a hearing examiner and testified. Her attorney was not present at this hearing, but she stated that she was willing to proceed without a representative or an attorney to represent her. Thereafter, on October 27, 1967, the hearing examiner determined that she was not entitled to a period of disability or disability benefits under the Act. Upon review, the Appeals Council, adopted the decision of the hearing examiner, and thus it became the final decision of the Secretary.

This action was timely filed on February 7, 1968. On motion of the defendant, the case was remanded to the Secretary on March 8, 1968, for further action.

The Appeals Council, by correspondence, notified the plaintiff's attorney of its proposed action on the court order remanding the case and furnished him with a copy of all documents which it proposed to introduce as exhibits. (Tr—13–16) By letter of July 17, 1968, Mr. Walter C. Cox, Jr., of the firm of Fowler, Rouse, Measle & Bell, attorneys for the plaintiff, advised the Appeals Council that he had "examined the proposed exhibits" and offered "no objections or comments". (Tr—12)

On August 14, 1968, the Appeals Council affirmed the decision of the hearing examiner and, upon motion of the Secretary, the case was redocketed in this court on September 23, 1968. An answer and transcript of all proceedings relating to the plaintiff's application were filed. The record is before the court on the defendant's motion for summary judgment. Both sides have filed briefs.

The plaintiff is now 52 years of age. She lives with her husband, who is disabled, and her father in Richmond, Kentucky. Her education is limited as she states she had to leave school in about the fourth grade. At the age of nine or ten she lost her left leg by amputation and has used crutches to walk since then. She has never worn a prosthesis, and states that she has three, "but I can't wear them. I can't walk on them, just someway they don't fit me. They hurt me so bad, I just can't press my leg down on them to make a step. I have never been able to try to walk on them." (Tr—39) She has done farm work such as pulling weeds and stripping tobacco. At one time she operated a mangle in a laundry but her principal occupation has been as a cook and dishwasher in small local restaurants. The record contains statements from several of her former employers which indicate that she was a good worker and, as one stated, "her impairment did not affect the quality of her work or the quantity of work." (Tr—107)

Her original application for benefits stated that she was disabled because of "left leg off—age 9—bladder trouble—stomach ulcer". (Tr—48) At the hear-

ing she testified in response to the examiner's questions as follows:

"Q What is it that seems to be bothering you most that would prevent you from working? You've worked in the past.

A From working, you mean?

Q Yes.

A My bladder. I can't stand, I don't have any control. I can't work out in public in that shape. I've had two operations already on it.

Q You say other than that if you did not have that condition, you would be able?

A Well, I probably would. I could go on, maybe, stand my stomach. Of course, it does put me in the hospital a lot, my stomach, but since I had that two operations on my bladder, I haven't been able to work out in public. I wish I could." (Tr—43)

With reference to her present medication she testified as follows:

"Q Are you taking something now for your indigestion, medication?

A Yes, I'm taking medicine from my doctor.

Q Who's your doctor?

A Dr. Grise. He doctors my stomach. Dr. Jenkins doctors my bladder. I have two doctors." (Tr—41)

Dr. W. P. Grise, of Richmond, Kentucky made the following report on August 31, 1967:

"She has Left Leg Amputation Without Prosthesis. Uses crutches to walk —In addition she has chronic symptoms from Duodenal ulcer & Hyperacidity. She is also disabled by virtue of her severe menopausal symptoms for which I'm treating her now—

I don't believe she is able to work at all. I do not believe her to be employable." (Tr—75)

Dr. Douglas H. Jenkins, a general surgeon of Richmond, Kentucky made a diagnosis on March 16, 1967, as follows: Chronic bladder disease, left amputation,

old, and functional G.I. disease. (Tr—71)

On February 9, 1967, Dr. Eugene Todd, to whom she refers as having operated on her bladder, in a joint letter with Dr. David H. Johnston, made the following report:

"This patient was last seen by Dr. Eugene Todd on March 3, 1965. She has not been seen by me since April 16, 1965 at which time she was doing fine following a hysterectomy for pelvic complaints. She was not disabled at that time and since I have not seen her since cannot give you any information regarding her present status." (Tr—67)

She was examined on April 11, 1967, by Dr. Robert Kinnaird, a full time specialist in Urology; on the same date Dr. James Rich, a full time specialist in radiology made a fluorscopic and film study of her stomach and upper G.I. tract (impression: essentially normal). (Tr—73)

She was admitted to the University of Kentucky Medical Center on May 22, 1967, and was discharged on May 26, 1967. There she was examined by Dr. Richard P. O'Neill, an internist on the medical school faculty. His findings were summarized by Dr. Barbara Bates as follows:

"As you know this 50-year-old woman has had long standing abdominal complaints including epigastric pain and some vomiting after greasy foods. She is an extremely nervous person and has noted also some stress incontinence and urinary urgency. Physical examination was essentially negative except for some tenderness in the left abdomen and an above-knee amputation of the left leg.

Laboratory studies included a normal complete blood count, urinalysis, protein bound iodine, fasting blood sugar, blood urea nitrogen and urine culture. The histoplasmin skin test was negative; an intermediate strength PPD was positive. Film of the abdomen, chest x-ray and gall bladder series

were all within normal limits. A sigmoidoscopy, although scheduled, appears not to have been done.

It was the opinion of the doctor who saw Mrs. Hendren that her symptoms were related to a functional bowel syndrome. Certainly an anxiety state also plays an important role in her symptoms. She does have a cystocele and reported to the Emergency Room in early June because of urinary incontinence. Definitive action was not taken in terms of this symptom. Perhaps you may wish to refer her to our Gynecology Clinic. At present Mrs. Hendren has no returned appointment here." (Tr—84)

On July 18, 1967, Dr. Samuel O. Hodges's examination revealed "a well developed, well nourished, white female who appears to be in no acute distress. She has a middle third amputation of the left femur, with a nice stump, well healed." (recommended adjustment of prosthesis which he felt could be worn) (Tr—74)

On April 4, 1968, she was examined by Dr. Edward H. Ray, Jr., of Lexington, recognized as one of the outstanding urologists in this area, for urologic evaluation. Briefly his finding was that she "has chronic urethrotrigonitis, possibly with some mild bladder neck obstruction. Though this condition is both disagreeable to have and to treat, it should not impose any functional limitations or interfere with any type of activity. It would perhaps, unless treated satisfactorily, limit her employability because of the frequent urination which she has at the present time. I feel that Mrs. Hendren should respond to treatment of her urethrotrigonitis with dilatation of the urethra, instillation of silver nitrate or dilute Furacin solution into the bladder, and the leaving of a suppository of Furacin in her urethra at intervals beginning at one week." (Tr—113)

At the request of the Appeals Council, Dr. Ray elaborated on his findings as follows:

"In reply to the questions posed by the Appeals Council, I find that approximately 90 to 95% of women who have chronic cicatricial urethrotrigonitis are completely relieved of their symptoms by conservative therapy in the office as outlined in my previous report. The length of treatment required before symptomatic relief occurs is variable with marked improvement in two to three weeks in some individuals, and with a period of treatment up to six months before satisfactory improvement is obtained in other individuals. Once satisfactory resolution of symptoms has occurred in the individual, the treatment is then carried on over a period of several months with progressive increase in the interval between individual treatments." (Tr—125)

On April 22, 1968, she had an extensive examination by Dr. John D. Perrine, Lexington, an internist with a subspeciality of Gastroenterology. His summary is as follows:

"Mrs. Sadie Hendren is a 52-year-old white lady who has had many complaints, apparently pertaining to her genitourinary and gastrointestinal symptoms. Her genitourinary system has been previously evaluated by Dr. Edward H. Ray, Jr. Her gastrointestinal complaints cannot be substantiated by any abnormal findings, either on physical examination, X-Ray examination, or gastroscopy. It appeared that her symptoms pertaining to her G.I. tract are all functional. She should be able to perform most any physical activity which does not require prolonged stooping, bending, or lifting, and this limitation would be only because of her missing left leg." (Tr—118)

This is supplemented with X-ray reports from the Central Baptist Hospital.

While the initial denial of her claim on April 18, 1967 (Exhibit 6, Tr—2–60) contains a gross error in referring to the claimant as a "thirty-eight year old agricultural and domestic laborer" (at that time she was fifty years old), the final decision of the Appeals Council shows that painstaking and exhaustive

attention has been given to the plaintiff's claim.

In the final decision there is an evaluation of the evidence. It is in words and figures as follows:

"The evidence establishes that the claimant's left leg had been amputated when she was a child, but that she had adjusted to the loss and was able to work at the jobs reviewed above. The record before remand did not show any incontinence demonstrable by medically acceptable clinical and laboratory diagnostic techniques. On the contrary, an examination by Dr. Kinnaird, a Board-certified urologist, on April 11, 1967, noted that 'coughing and straining with a full bladder did not produce any leakage.' (Exhibit 12)

Following remand, the claimant had an extensive medical evaluation and a separate urological evaluation with extensive laboratory studies. Dr. Perrine's study showed that the claimant has a small hiatus hernia which is asymptomatic but no other gastrointestinal impairment. Dr. Perrine also concluded that the claimant's missing left leg would prevent only prolonged stooping, bending or lifting.

The urological study showed a normal urine and normal bladder capacity and contour. It is significant that Dr. Ray's examination disclosed that the claimant was able to urinate fully and no residual urine was found in the bladder. Based on the results of his examination, Dr. Ray reported that the claimant's genitourinary impairment, a local irritating condition of the urethra and bladder, should not interfere with any type of activity.

Thus, the medical examinations conducted after remand confirm that the claimant does not have a disabling medical impairment. Her claimed incontinence is not demonstrable by clinical and laboratory diagnostic techniques.

It is true that Dr. Ray said that frequent urination might limit the claimant's employability unless treated satisfactorily. Dr. Ray's referral to frequent urination was based on the claimant's statement to him; there is no medical evidence that such condition exists. Yet, even if the condition does exist, the symptoms would be relieved in a short time by the treatment Dr. Ray suggested. It should also be noted that on April 11, 1967, Dr. Kinnaird recommended a similar course of treatment, but that as of April 4, 1968, the claimant had not followed his advice.

Consequently, the Appeals Council finds that the claimant does not have any medical impairment or combination of impairments which would in any way prevent her from doing the work she had previously performed.

After careful consideration of the entire record, the Appeals Council specifically finds that the claimant has not been under a 'disability' as defined in the Social Security Act, as amended, through the date of this decision." (Tr—9)

The plaintiff meets the special insured status requirements through the quarter ending June 30, 1969. Therefore, on the basis of her application of January 31, 1967, she must establish that she was under a disability which commenced prior to August 14, 1968, when the final decision of the Secretary was rendered in this case.

It is not the province of this court to consider the evidence de novo and judicial review is limited to inquiry as to whether there is substantial evidence in the record as a whole to support the findings of the Secretary. Lewis v. Gardner, 6 Cir., 396 F.2d 436; Nelson v. Gardner, 6 Cir., 386 F.2d 92; Hall v. Gardner, 6 Cir., 403 F.2d 32 (decided November 27, 1968).

While it is unfortunate that the plaintiff has only one leg and walks with crutches, this is a condition which has existed for approximately 41 years and is one which has not prevented her from being gainfully employed. Her chief complaint seems to be incontinence but

Dr. Robert Kinnaird stated that she did not mention it until his direct questioning. It was his opinion that she occasionally has some incontinence due to urgency and a delay in getting to the bathroom but that she has no real stress incontinence (incontinence of urine due to anatomic displacement by which an opening pull is exerted on the bladder orifice, as by straining or coughing (22nd Edition, Dorland's American Illustrated Medical Dictionary)). (Tr—72)

This does not interfere with her doing normal housework, cooking, piecing quilts, attending church and Sunday School. The restaurants in which she worked as a cook were of the truck stop type. She stated that her last employment was at Abby Gales Restaurant and when asked what kind of a restaurant it was, she replied, "Abby Gale's, Clays Ferry before the expressway came through and took it away, just all those restaurants up and down Richmond Road." (Tr—39) Another one of her employers, in this same locality, recalled that "she quit the job when she moved to Richmond, Kentucky and had no way to get to and from the restaurant." (Tr—108)

The plaintiff stated that she moved to Richmond two years prior to the hearing and had evidently lived in the Clays Ferry area where her employment was prior to that time.

In the case of Stumbo v. Gardner, 6 Cir., 365 F.2d 275, the applicant for disability benefits was fifty-six years old and her principal occupation was that of a cook. There was a wide divergence among the medical experts who testified and her own testimony and some of the medical evidence supported her claim of disability. There was, however, medical evidence to the contrary and the Appeals Council resolved the issue in favor of the Secretary and denied her claim. The district judge found that the findings were supported by substantial evidence and the appellate court held that he applied the correct rule. This case is cited particularly because of the similarity in the occupation and age of the applicants for disability benefits.

 The court must conclude that the Secretary's findings are supported by substantial evidence, and an order is entered as of this date sustaining the motion of the Secretary for summary judgment and dismissing the complaint at the cost of the plaintiff.